FJN:NDB
F. #2023R00466 / NY-NYE-0944

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

VOLODYMYR SIERKOV,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

COMPLAINT AND AFFIDAVIT IN SUPPORT OF APPLICATION FOR ARREST WARRANTS

(18 U.S.C. § 1960(a))

24-MJ-589 (CLP)

EASTERN DISTRICT OF NEW YORK, SS:

    LUCAS LAWRENZ, being duly sworn, deposes and states that he is a Special Agent with the Drug Enforcement Administration, duly appointed according to law and acting as such.

    In or about and between October 2023 through February 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant VOLODYMYR SIERKOV, together with others, did knowingly conduct, control, manage, supervise, direct and own all or part of an unlicensed money transmitting business affecting interstate and foreign commence, to wit: a money transmittal business, which (a) operated without an appropriate money transmitting license in the State of New York, where such operation is punishable as a misdemeanor and a felony under New York State law; and (b) failed to comply with the money transmitting business registration requirements under Title 31, United States Code, Section 5330 and the regulations prescribed thereunder.

    (Title 18, United States Code, Section 1960(a))

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been involved in the investigation of numerous cases involving narcotics trafficking and money laundering organizations. I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file; and from reports of other law enforcement officers involved in the investigation.

2. The DEA and Internal Revenue Service ("IRS") have been investigating a large-scale, international money laundering organization ("MLO") with networks operating in, among other places, New York, California, Illinois, Indiana, Massachusetts, and Texas. The MLO uses several methods to conceal the nature, source, ownership, and control of the suspected illicit proceeds to avoid scrutiny by law enforcement and banking institutions. One such method involves recruiting and paying individuals, like the defendant, to act as couriers who receive bulk cash and deposit it into business bank accounts controlled by the MLO.

The MLO's Couriers' Modus Operandi

3. The MLO's couriers generally receive text messages from co-conspirators directing them to arrange the pickup of bulk U.S. currency from other co-conspirators. At times, the couriers travel to different states to pick up and deposit bulk cash for the MLO. The couriers receive bulk cash, which they bring to banks where they hold accounts, specifically Commercial Bank 1. The couriers then deposit the cash <u>not</u> into their own account(s), but into third-party business accounts as directed by the MLO, specifically accounts owned by the limited liability

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

2

corporations Ozali LLC ("Ozali") and Ozcars LLC ("Ozcars"). Because the cash is not deposited into the courier's account, the transaction does not appear on the courier's bank statement, which helps to conceal the transaction. Once the bulk cash is deposited, the MLO then transfers the funds from the Ozali and Ozcars business bank accounts to other business bank accounts, both foreign and domestic. For completing each transaction, the MLO pays couriers either a flat fee or a percentage of the cash deposited.

4. Ozali and Ozcars were established on July 13, 2023, and November 30, 2023, respectively. Both are California LLCs registered at to the same residential address in Long Beach, California. Both have a stated business purpose of providing consulting services, and both have little to no internet footprint or other indication of legitimacy.

Co-Conspirator 1

5. A bank teller at a Commercial Bank 1 branch located in Houston, Texas reported that co-conspirator ("CC-1") came into the branch on or about January 12, 2024, to deposit a total of approximately $500,000 cash to the Ozali business account. After the deposit, the Ozali business account initiated multiple outgoing wire transfers. CC-1 brought the cash into the bank in luggage, which held bundles of cash that were tightly wrapped with plastic wrap and dryer sheets. When the bank teller asked CC-1 where the cash came from, CC-1 stated that the company sells cars to people from Ukraine who purchase the cars with cash. Most of the deposits, approximately $446,900, were in denominations of 20-dollar bills, with the remainder in denominations of 100, 50, 10, and 5-dollar bills.

6. A bank teller at a Commercial Bank 1 branch located in Boston, Massachusetts, reported that CC-1 came into the branch on or about January 31, 2024, to deposit a total of approximately $268,000 cash. Although CC-1 had initially wanted to deposit all the

cash into a single business account, after speaking on the phone with someone, CC-1 changed his mind.  Ultimately, CC-1 deposited approximately $200,000 cash into the Ozcars business account, and approximately $68,060 cash into the Ozali business account.  CC-1 told the bank teller that the businesses collect cash from clients and send it to Ukraine to purchase vehicles.  CC-1 stated that he is a partner and works with the owner of the business accounts.

7.  On or about March 9, 2024, CC-1 was interviewed by members of law enforcement.  After advising CC-1 of his <u>Miranda</u> rights, which CC-1 waived in writing, CC-1 stated that, in approximately May 2023, he arrived in the United States from Ukraine.  CC-1 was then contacted by a friend from Ukraine who offered him a job in which CC-1 would, as directed by the MLO, pick up bulk U.S. currency and deposit it into bank accounts controlled by the MLO.  CC-1 stated that the MLO pays him a three-percent commission for each transaction he completes.  CC-1 stated that he conducted more than 30 such money pickup-and-deposit-transactions in states including New York, New Jersey, and Illinois.  CC-1 estimated that the most cash he picked up at one time was between approximately $400,000 and $500,000.  Upon receipt of the bulk currency, CC-1 deposits it into the Ozali and Ozcars bank accounts as directed.  He does not know who owns the accounts.

8.  CC-1 stated that, two days earlier, on or about March 7, 2024, he flew from LaGuardia Airport in Queens, New York, to Chicago, Illinois, to pick up and deposit bulk cash for the MLO.  When CC-1 arrived in Chicago, CC-1 met a co-conspirator from whom CC-1 received approximately $142,605 in U.S. currency, which CC-1 deposited into the Ozali business account.

9.  On or about March 8, 2024, CC-1 arrived in New York City and conducted three separate money pickups.  CC-1 provided agents with bank deposit slips

4

reflecting a $200,000 cash deposit to the Ozcars business account at 9:49 a.m. at a Commercial Bank 1 branch in Manhattan; a $99,850 cash deposit to the Ozali business account at 9:50 a.m. at the same Commercial Bank 1 branch in Manhattan; and a $125,000 cash deposit to the Ozcars business account at 12:47 p.m. at another Commercial Bank 1 branch in Manhattan.

10. Between approximately September 2023 and March 2024, CC-1 received and deposited approximately $13.7 million in bulk U.S. currency into the Ozali and Ozcars bank accounts at various branches of Commercial Bank 1.

SIERKOV

11. A bank teller reported that, on or about January 24, 2024, the defendant VOLODYMYR SIERKOV deposited approximately $299,714 bulk cash into the Ozali business bank account at a Commercial Bank 1 branch located in Washington, D.C. The teller stated that SIERKOV returned the next day and deposited approximately $290,041 in bulk cash into the same Ozali account; he did not speak English and used his cellular telephone to translate for him; he brought the cash into the bank in grocery bags; and he stated that the money came from Ukraine, and his sister owns Ozali, which sells cars. SIERKOV also provided the bank teller with a California ID that listed the business address of Ozali as his own.

12. On or about February 1, 2024, agents conducting surveillance saw SIERKOV meet with a co-conspirator ("CC-2") in the parking lot of a hotel in Indianapolis, Indiana, where CC-2 walked to SIERKOV and handed SIERKOV a black rolling suitcase that CC-2 had brought with him from the hotel. CC-2 then returned to the hotel. SIERKOV waited in the parking lot with the suitcase until a black Toyota SUV met him there, at which point SIERKOV placed the suitcase in and entered the vehicle which then drove SIERKOV to a Commercial Bank 1 branch located in Carmel, Indiana. SIERKOV exited the vehicle with the

5

suitcase. Agents approached SIERKOV in the parking lot behind the bank and identified themselves as law enforcement. SIERKOV indicated that he spoke Russian and used Google Translate to communicate with the agents. SIERKOV stated that he understood and voluntarily agreed to speak with agents. He stated that there was an unknown quantity of money from an unknown source in the suitcase he possessed; he had received instructions on his cellular telephone to deposit the money into the Ozali business bank account for "consulting, management;" he had received additional currency that he had in his hotel room; he had traveled from California to Indiana earlier that day to receive and deposit money, and he intended on returning to California the following day. SIERKOV gave consent for agents to search the suitcase he had, which contained multiple tightly wrapped bundles of U.S. currency wrapped in plastic, which totaled approximately $250,020. That cash was seized.

13. SIERKOV gave consent for agents to search his hotel room. Agents then drove SIERKOV to his hotel where SIERKOV provided his key card to his hotel room to agents. SIERKOV stated that a black suitcase near the bed contained approximately $500,000, which he had been instructed to deposit into the Ozali bank account. SIERKOV gave consent to search the suitcase, which contained multiple tightly wrapped bundles of U.S. currency wrapped in plastic, which totaled approximately $500,207. That cash was seized.

14. SIERKOV gave consent for agents to search his cellular telephone and provided agents with its passcode. Agents dialed in a colleague fluent in Ukrainian to interpret their communications with SIERKOV. SIERKOV was advised of his Miranda rights, which he waived. SIERKOV described the unknown male he met earlier that day who had provided SIERKOV with the suitcase of currency that was in his hotel room; SIERKOV explained, earlier in the day, he had confirmed the courier's identity by reference to the serial number of a dollar

bill; SIERKOV had received the serial number of that dollar bill beforehand from a co-conspirator; SIERKOV and other couriers arranged to pick up money via an encrypted communications application that automatically deletes messages once they have been read; SIERKOV was only in Indiana to receive and deposit cash for the MLO; SIERKOV had previously received and deposited quantities of cash for the MLO in various states including California and Washington, D.C.; and SIERKOV anticipated that he would be paid $500 for completing the transactions in Indiana.

15. SIERKOV's cell phone contained messages between SIERKOV and ▮ ▮ in which, on or about January 5, 2024, SIERKOV sent ▮ two photographs of large amounts of rubber-banded U.S. currency.

16. Between approximately October 2023 and February 2024, SIERKOV deposited approximately $16.9 million in bulk cash into the Ozali and Ozcars bank accounts. Of that, more than $14 million cash was deposited at banks in Brooklyn and Queens, New York.

17. On or about July 12, 2024, in a statement signed under penalty of false statement and perjury under Title 18, United States Code, Sections 1001 and 1621, SIERKOV submitted documentation to the U.S. government claiming that the approximately $750,000 bulk cash that was seized from him on or about February 1, 2024, was principally constituted of "fundraising to help with the war effort [in Ukraine]" and, because it was "primarily collected from Ukrainian nationals or former citizens of Ukraine all over the United States[,] . . . donations were intended to be kept private and all in cash. . . . [because the donors] fear reprisal if donations are made public." While "the overwhelming majority of the funds collected were for Ukrainian relief efforts," some portion was claimed to be related to SIERKOV's "family . . . car business[, which] . . . ship[s] vehicles to Ukraine in support of relief efforts." These statements

7

are inconsistent with contemporaneous statements that SIERKOV made at the time the money was seized, his prior statements, agent observations and surveillance the day the money was seized, and electronic evidence.  See supra ¶¶ 11-15.

Unlicensed Money Transmittal

18. At all times relevant to this complaint, the defendant did not have the appropriate money transmitting license in the State of New York as required by law.

19. At all times relevant to this complaint, the defendant failed to comply with the money transmitting business registration requirements under Title 31, United States Code, Section 5330 and the regulations prescribed thereunder.

20. I respectfully request that this Court issue an order sealing, until further order of the Court, all materials submitted in support of this application, including the application and arrest warrant.  Premature disclosure of these materials would give the defendant an opportunity to flee from prosecution, change patterns of behavior, and destroy or tamper with evidence.  Therefore, such disclosure would have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

WHEREFORE, your deponent respectfully requests that a warrant issue for the arrest of the defendant VOLODYMYR SIERKOV, so that he may be dealt with according to law.

_____
LUCAS LAWRENZ
Special Agent, Drug Enforcement Administration

Sworn to before me this
25 day of October, 2024

_____
THE HONORABLE CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK