UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------x

UNITED STATES OF AMERICA, :

-against- :

VOLODYMYR SIERKOV, :

Defendant. :

-----------------------------------------------------x

**OPINION AND ORDER**
**25-cr-79 (DLI)**

**DORA L. IRIZARRY, United States District Judge:**

Defendant Volodymyr Sierkov ("Defendant") is charged by indictment with operating an unlicensed money transmitting business in violation of 18 U.S.C. §§ 1960 *et seq*. *See*, Indictment, Dkt. Entry No. 11. Defendant moved to suppress statements and evidence acquired from two suitcases and his cellphone alleging they were obtained in violation of his constitutional rights. *See*, Def.'s Mot. to Suppress, Dkt. Entry No. 27. The Government opposed. *See*, Gov't Opp'n, Dkt. Entry No. 32. Defendant replied. *See*, Def. Reply, Dkt. Entry No. 33.

The Court held a suppression hearing on April 16, 2026 (the "April 16 Hearing").[1] *See*, Minute Entry dated April 16, 2026. At the April 16 Hearing, the Government presented testimony from Special Agents Erik Collins ("SA Collins") and Lucas Lawrenz ("SA Lawrenz"). *See*, Tr. at 10:13-16; 73:2-5. The Court finds SA Collins and SA Lawrenz credible. The defense did not present any evidence or call any witnesses in support of the motion. Defendant attached to his motion an affidavit with his version of events. *See*, Mot. at 20-22. However, as Defendant did not testify and the credibility of the conclusory, self-serving statements in the affidavit could not be challenged, the Court does not consider it in deciding the instant motion.

---

[1] "Tr." refers to the transcript of the April 16 Hearing.

On May 6, 2026, Defendant filed a post-hearing brief in support of his motion. *See*, Def.'s Post-Hr'g Mem., Dkt. Entry No. 49. On May 22, 2026, the Government filed a post-hearing opposition. *See*, Gov't's Post-Hr'g Opp'n, Dkt. Entry No. 53. On June 5, 2026, Defendant filed his post-hearing reply. *See*, Def.'s Post-Hr'g Reply, Dkt. Entry No. 54. For the reasons set forth below, Defendant's motion is granted only as to the pre-*Miranda* statements made during the December 2, 2024 interrogation, and is denied in all other respects.

## FINDINGS OF FACT

### I. The February 1, 2024, Interrogation

#### A. The Bank of America Parking Lot

On February 1, 2024, as part of a Drug Enforcement Agency ("DEA") investigation into suspected money laundering, DEA agents conducted surveillance outside the Drury Inn Hotel in Indianapolis, Indiana. Tr. at 12:19-13:5. At that time, the investigation concerned a known money launderer who was staying at the hotel (the "Subject"), and Defendant was unknown to the investigating agents. *Id.* at 13:1-5. At approximately 2:30 pm, the DEA agents observed the Subject exit the hotel, approach Defendant, and hand him a suitcase ("Suitcase 1"). *Id.* 13:23-25; 15:7-9; 35:5-13. Defendant then called a rideshare car from the hotel parking lot that took him to a local Bank of America branch. *Id.* at 15:14-18.

At approximately 2:35 pm, SA Collins, three other DEA agents, and approximately three Indiana State Troopers (the "State Troopers") followed Defendant to the Bank of America location. *Id.* at 60:1-62:22. SA Collins approached Defendant and identified himself as law enforcement, displayed his DEA badge, and asked if they could speak. *Id.* at 14:1-23. SA Collins wore plain clothes and stood approximately five feet away from Defendant. *Id.* at 14:8-16. Another DEA agent, TFO Matney, also in plain clothes, stood approximately 10-15 feet from

Defendant.[2] *Id.* at 14:11-16. Neither SA Collins nor the other DEA agents had any visible police markings, badges, or weapons. *Id.* at 14:16-17. The three uniformed State Troopers, who were visibly armed, parked their marked police vehicles approximately 15-20 feet away from Defendant and stood by their vehicles. *Id.* at 14:12-14; 60:14-62:8.

After determining that Defendant spoke Russian, but not English, SA Collins asked one of the State Troopers to locate a Russian interpreter and, in the meantime, began using Google Translate to communicate with Defendant. *Id.* at 16:24-25; 17:18-25. SA Collins asked Defendant for his identification, and Defendant displayed a California driver's license with the name Sierkov. *Id.* at 17:11-15. As SA Collins turned to talk to one of the State Troopers, one of the DEA agents requested to "see his hands," indicating that Defendant should take his hands out of his pocket. *See*, Govt. Ex. 6 at 1:18-1:26. Defendant asked the same agent if he could smoke, and the agent told him to wait. *Id.* at 2:25-36.

SA Collins then began to question Defendant using Google Translate. Tr. at 18:11-15. He told Defendant that someone called him in for being "suspicious" with the suitcase, and asked Defendant what he was doing in Indianapolis. *See*, Govt. Ex. 6 at 3:35-4:03. Defendant explained via Google Translate that he obtained Suitcase 1 from another individual and that it contained money. Tr. at 18:13-20. He went on to say that he had been instructed to deposit that money into a Bank of America account. *Id.* Defendant pulled out his phone and showed SA Collins a "Notes" app entry containing the Bank of America account number, routing number, and business address associated with the account he had been instructed to deposit the money into, along with the terms "consulting, management." *Id.* at 18:22-25. Defendant also explained that he had done this type of transaction in the past, but did not know where the money came from. *Id.* at 38:12-21.

[2] SA Collins' testimony did not clearly identify where the other two DEA agents stood during the parking lot encounter.

At around 2:44 pm, SA Collins asked Defendant for his consent to conduct a canine search of Suitcase 1 and his backpack. *Id.* at 21:4-6. Defendant orally consented to the search. *Id.* at 21:8. One of the State Troopers brought a canine unit to search both Suitcase 1 and the backpack by smelling them, and the dog gave a positive alert to the suitcase, but not the backpack. *Id.* at 21:10-16. SA Collins asked Defendant if Suitcase 1 contained drugs, to which Defendant said, "not to [my] knowledge." *Id.* at 21:21-24. At approximately 2:48 pm, SA Collins asked Defendant for consent to search Suitcase 1, which Defendant gave. *Id.* at 21:24-22:8. SA Collins opened Suitcase 1 and observed a large amount of U.S. currency, which he showed to Defendant, and then informed him that they were seizing Suitcase 1 and the money inside as suspected drug proceeds. *Id.* at 22:11-18.

SA Collins then asked for consent to search Defendant's backpack. *Id.* at 22:18-19. Defendant gave his consent, and SA Collins performed a brief search of the backpack, but did not find any items of evidentiary value. *Id.* at 22:18-20. Seeing no clothes or other items that he expected a person to have for an overnight trip, SA Collins asked Defendant where he was staying. *Id.* at 22:23-25. Defendant said he was staying at a hotel and showed SA Collins a picture on his phone. *Id.* at 22:25-23:3. Defendant also said he had more money in his hotel room. *Id.* at 24:7-8. At 2:54 pm, SA Collins asked if Defendant would return to the hotel with them and consent to a search of his room. *Id.* at 24:13-15. Defendant consented. *Id.* at 24:16-17.

The State Troopers were to take Defendant to the hotel. *Id.* at 24:20. One of the State Troopers performed a brief pat down search of Defendant, handling several of the items in his pockets. Govt. Ex. 3-B at 00:00-10. The same State Trooper then proceeded to handcuff defendant, but another State Trooper explained that Defendant did not need to be handcuffed. *Id.* at 00:10-18; Tr. at 45:19-25. Defendant, unrestrained, got into the front seat of the marked police

vehicle and was driven approximately thirty minutes to the hotel. Tr. at 24:19-25:11. At one point during the ride, the State Trooper realized that one of the car doors was ajar, so he pulled over, exited the vehicle, and closed one of the rear doors, all while Defendant remained in the front passenger seat. *Id.* at 46:7-18. There were no substantive discussions between the State Trooper and Defendant during the drive to the hotel. Govt. Ex. 3 at 02:15-32:40.

**B. The Hotel Search**

At approximately 3:33 pm, SA Collins, the three other DEA agents, and Defendant walked into the hotel lobby and took the elevator to the third floor while the State Troopers remained in the parking lot. *Id.* at 25:17-26:25; 47:1-18. SA Collins asked Defendant for his cellphone, which Defendant handed over along with his hotel key card. *Id.* at 25:17-26:6. SA Collins used the key card to open Room 303, where Defendant was staying. *Id.* at 25:17-19; 26:11. The DEA agents performed a safety sweep and entered the room after deeming it safe. *Id.* at 26:11-16. The room contained a kitchenette, table, couch, and a king-sized bed. *Id.* at 48:5-7. There also was an open beer can on the desk and a black suitcase near the bed ("Suitcase 2"). *Id.* at 48:8-10. Defendant asked if he could finish the beer, which the agents allowed. *Id.* at 48:13-18.

At 3:44 pm, SA Collins sat down with Defendant and asked where the additional U.S. currency was located. *Id.* at 27:1-5. Defendant pointed to Suitcase 2 next to the bed. *Id.* at 27:5-6. At 3:45 pm, SA Collins asked for consent to open Suitcase 2, which Defendant gave. *Id.* at 27:9-10. SA Collins opened Suitcase 2 and observed a large amount of U.S. currency in tightly wrapped bundles. *Id.* at 27:12-14. SA Collins informed Defendant that this money also was being seized as suspected drug proceeds. *Id.* at 27:17-18.

At 3:48 pm, a DEA agent fluent in Russian and Ukrainian became available, and SA Collins called him on speakerphone to translate. *Id.* at 27:22-28:5, 49:18-50:2. Through the

interpreter, SA Collins asked Defendant where he had gotten Suitcase 2 and what he planned to do with it and its contents. *Id.* at 28:6-9. Defendant said that he had received it from someone in a black SUV that morning, confirmed it contained U.S. currency, and had planned to deposit it into the same Bank of America account he had described earlier. *Id.* at 28:10-15. SA Collins asked to see the text messages with the directions Defendant had described, and Defendant unlocked his phone while shielding his passcode before showing the messages. *Id.* at 54:2-10.

After approximately ten minutes of discussion, SA Collins asked if Defendant would be willing to cooperate with law enforcement. *Id.* at 29:14-24. SA Collins also asked about Defendant's immigration status because internal DEA procedures for registering a person not legally present in the United States as a confidential informant "is very cumbersome." *Id.* at 54:16-23. SA Collins did not otherwise inquire into Defendant's immigration status, nor threaten to report him to immigration authorities if he failed to cooperate. *Id.* at 54:24-55:5.

Near the end of the discussion, SA Collins reminded Defendant that the DEA was seizing the contents of both Suitcase 1 and Suitcase 2 as suspected drug proceeds, and also seized Defendant's cellphone as evidence. *Id.* at 29:25-30:12. SA Collins asked Defendant for his cellphone passcode and for consent to search the device. *Id.* at 31:4-12. Defendant provided his passcode and gave his consent. *Id.* at 31:12-13. Then, SA Collins drove Defendant to a nearby store to buy a new cellphone. *Id.* at 30:8-15. SA Collins also offered to drive Defendant back to the hotel, but Defendant declined and said he would get his own ride. *Id.* at 30:17-25.

At no point during the events of February 1, 2024, did any law enforcement officer read *Miranda* warnings to Defendant or advise him, through Google Translate or the interpreter, that he had the right to refuse to consent to any search. *Id.* at 68:20-70:4. Nor did Defendant ever ask to speak to an attorney. *Id.* at 31:23-24. The entire interaction between Defendant and law

enforcement lasted approximately ninety minutes.

## II. The December 2, 2024, Interrogation

On October 25, 2024, the Honorable Cheryl L. Pollak, U.S. Magistrate Judge of this Court, endorsed a complaint charging Defendant with operating an unlicensed money remitting business and issued a warrant for his arrest. *See*, Complaint, Dkt. Entry No. 1; Arrest Warrant, Dkt. Entry No. 2. SA Lawrenz, who is an Immigration and Customs Enforcement ("ICE") officer, and a New Jersey City police officer were tasked with locating and arresting Defendant. Tr. at 74:19-75:18.

At approximately 9:00 pm on December 2, 2024, SA Lawrenz and two officers located Defendant in Norwood, Massachusetts. *Id.* at 76:5-11. SA Lawrenz and the two officers, all in plain clothes and driving unmarked police vehicles, put on police vests with prominent police insignia and approached Defendant, who was sitting in the cab of an 18-wheel semi-truck. *Id.* at 76:12-25. None of the officers' weapons were visible. *Id.* at 76:1-4. SA Lawrenz motioned for Defendant to exit the vehicle, and Defendant stepped out of the cab wearing a shirt, underwear, and boots, but no pants. *Id.* at 77:3-14.

SA Lawrenz communicated briefly with Defendant in English and Russian to the best of his ability while another officer retrieved shorts and a jacket for Defendant from the truck. *Id.* at 77:22-78:25. Then, SA Lawrenz asked if Defendant would accompany them to a nearby hotel so they could talk in the lobby where it would be warmer. *Id.* at 78:13-21. Defendant agreed. *Id.* at 78:22-23. Defendant got into the passenger seat of SA Lawrenz's unmarked police vehicle and the officers drove their respective vehicles to the hotel. *Id.* at 79:1-8. Upon arriving at the hotel, SA Lawrenz and the other officers took off their police vests and went with Defendant into the lobby where they sat in a quiet corner near the back. *Id.* at 79:3-8. SA Lawrenz called a police officer who spoke Russian and English to serve as a translator. *Id.* at 79:23-25.

With the assistance of the translator, SA Lawrenz formally introduced himself and the other officers and informed Defendant that they possessed a signed arrest warrant for him related to the money that was seized on February 1, 2024. *Id.* at 80:6-9. SA Lawrenz told Defendant that, despite the arrest warrant, he was not under arrest at that time because the officers needed to determine whether to arrest him formally in Massachusetts or New Jersey. *Id.* at 81:1-17. SA Lawrenz explained that, if Defendant was arrested in Massachusetts, he would be held overnight in Boston and presented in court in Massachusetts the following day before being extradited to New York. *Id.* Alternatively, if Defendant was transported to New Jersey, he would be processed in Newark and taken directly to the Eastern District of New York the following day. *Id.* Defendant said he preferred to go to New Jersey. *Id.* at 81:24-25.

SA Lawrenz also discussed Defendant's work-related logistical issues and agreed to drive Defendant back to his truck so that he could transport it to the next designated delivery location. *Id.* at 80:15-83:17. Before leaving the hotel, SA Lawrenz asked Defendant, in substance, if he would be willing to discuss the people that he worked for when the DEA seized money from him on February 1, 2024. *Id.* at 96:22-99:6. Defendant protested that he had been cooperating with the DEA in the past and, in his view, was continuing to cooperate. *Id.* at 97:5-16. The officers and Defendant then left the hotel and drove Defendant to his work truck, which he drove to the next delivery location with the officers following in their respective vehicles. *Id.* at 83:8-84:13.

After the truck was delivered, SA Lawrenz drove Defendant to a nearby convenience store to pick up supplies for the drive to New Jersey. *Id.* at 84:14-19. Defendant was not handcuffed and smoked a cigarette outside the convenience store. *Id.* at 84:20-85:10. SA Lawrenz and Defendant then got back into SA Lawrenz's vehicle and they all drove towards New Jersey in a three-car convoy. *Id.* at 85:17-21. For the first few minutes, SA Lawrenz focused on navigating

through side roads to find the interstate and only engaged in minor conversation with Defendant. *Id.* at 85:24-86:4. SA Lawrenz turned on Russian music and Defendant laughed. *Id.* at 86:4-5.

Once the convoy reached the interstate, SA Lawrenz started to turn the conversation to Defendant's involvement in the money laundering organization. *Id.* at 85:24-87:18. During the ride, from around 10:30 to 11:00 pm, SA Lawrenz read Defendant his *Miranda* rights from a card that he kept in his wallet while Defendant translated using Google Translate. *Id.* at 87:20-90:21. At no point did Defendant request to speak to an attorney. *Id.* 91:7-9. For the remainder of the drive to New Jersey, SA Lawrenz questioned Defendant about the money laundering activities. *Id.* at 91:23-92:17. SA Lawrenz further testified that, throughout the evening, Defendant brought up "various things about his bosses" on his own, but SA Lawrenz deflected that topic of conversation until after he had read Defendant his *Miranda* rights. *Id.* at 92:1-17. At no point did SA Lawrenz or the other officers threaten to report Defendant to immigration authorities or to prosecute his son if he did not cooperate. *Id.* at 82:20-83:1.

## DISCUSSION

### I. Suppression of Defendant's Statements

#### A. Legal Standard

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Pursuant to *Miranda v. Arizona*, law enforcement may not interrogate an individual who is in custody without first warning that individual of his "right to remain silent, that anything he says can be used against him in a court of law, [his] right to the presence of an attorney, and that[,] if he cannot afford an attorney[,] one will be appointed for him prior to any questioning if he so desires." *United States v. Pence*, 172 F.4th 213, 217 (2d Cir. 2026) (quoting *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966)).

The requirements of *Miranda* only apply if: (1) the defendant is in custody; and (2) subject to interrogation. *Id.* (citing *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011)). "Absent a *Miranda* warning and a knowing and intelligent waiver of the rights to counsel and to remain silent, 'no evidence obtained as a result of [custodial] interrogation can be used against a defendant.'" *Id.* (quoting *Miranda*, 384 U.S. at 478-79)).

Courts determine whether an individual is in custody for purposes of *Miranda* through an objective, two-pronged inquiry that asks: (1) "what were the circumstances surrounding the interrogation; and . . ., given those circumstances, [(2)] would a reasonable person have felt that he or she was not at liberty to terminate the interrogation and leave." *United States v. Badmus*, 325 F.3d 133, 138 (2d Cir. 2003) (internal quotation marks and citation omitted). Courts in this Circuit consider the totality of the circumstances, including, but not limited to:

> (1) the interrogation's duration; (2) its location (*e.g.*, at the suspect's home, in public, in a police station, or at the border); (3) whether the suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons were present and especially whether they were drawn; and (6) whether the officers told the suspect he was free to leave or under suspicion.

*Pence*, 172 F.4th at 218. Law enforcement need not provide *Miranda* warnings where "[t]he essential ingredients of a 'police-dominated atmosphere' and compulsion are not present.'" *Illinois v. Perkins*, 496 U.S. 292, 296 (1990).

"An interrogation occurs when a suspect 'is subjected to either express questioning or its functional equivalent' and his statements are 'the product of words or actions on the part of the police' that were 'reasonably likely to elicit an incriminating response.'" *United States v. Familetti*¸ 878 F.3d 53, 57 (2d Cir. 2017) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 303 (1980)). Not all police questioning constitutes interrogation, as certain questions may be "necessary to secure their own safety or the safety of the public." *Id.* (quoting *New York v. Quarles*,

467 U.S. 649, 658-59 (1984)). Questions that relate simply to an individual's "basic identification" also do not constitute interrogation. *Id.* Voluntary statements made outside of custodial interrogation are not barred by the Fifth Amendment. *See*, *Miranda*, 384 U.S. at 478.

**B. Defendant's February 1, 2024, Statements**

Defendant seeks to suppress all statements made during the events of the February 1, 2024, interrogation (the "February 1 Interrogation"), including the provision of his cellphone passcode. Defendant contends that, because he was not informed of his *Miranda* rights before he was subjected to custodial interrogation, his statements were obtained in violation of his Fifth Amendment right against self-incrimination.[3] *See*, Def.'s Post-Hr'g Mem. at 4-5. The Government opposes on the ground that Defendant was not "in custody," and thus *Miranda* warnings were not required. *See*, Govt.'s Post-Hr'g Opp'n at 26-30. It is undisputed that law enforcement did not provide Defendant *Miranda* warnings during the February 1 Interrogation. *See*, Dkt. Entry No. 34. Nor does the Government contend that SA Collins' questions do not constitute "interrogation" for purposes of *Miranda*. *See*, Dkt. Entry No. 34. Thus, the only remaining issue is whether Defendant was "in custody" during the February 1 Interrogation.

Several aspects of the interrogation suggest that a reasonable person in Defendant's shoes might not have felt at liberty to terminate the interrogation and leave. First, Defendant was surrounded by seven law enforcement officers at the Bank of America parking lot, three of which were uniformed and visibly armed, and then was accompanied by four officers in the hotel room. *See*, *United States v. Ali*, 68 F.3d 1468, 1470-73 (2d Cir. 1995) (defendant who was pulled aside

[3] In his initial moving papers, Defendant argued that his statements also should be suppressed pursuant to the Sixth Amendment. *See*, Def.'s Mot. to Suppress at 1, 18 ("For the foregoing reasons, we respectfully request that the Court (i) suppress statements obtained from Mr. Sierkov in violation of the Fifth and Sixth Amendments. . . ."). While it appears that Defendant has constructively abandoned this argument by failing to raise it at the April 16 Hearing or in his supplemental briefing, it necessarily fails because it is black letter law that one's Sixth Amendment rights do not attach until after formal charges have been filed. *See*, *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991).

for fifteen minutes at an airport boarding gate by at least five uniformed officers with visible weapons was in custody). Second, by informing Defendant that the DEA was seizing the cash inside Suitcase 1 and Suitcase 2 as suspected drug proceeds, SA Collins implicitly implicated Defendant in illegal activity, to wit, money laundering. *See*, *Pence*, 172 F.4th at 219 (explaining that confronting a defendant with evidence of his own guilt is another factor that courts may consider). Third, and importantly, none of the officers ever told Defendant that he was not under arrest or that he was free to leave. *See*, *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998) (considering "whether a suspect is or is not told that she is free to leave").

However, more factors militate in favor of finding that Defendant was not in custody. For instance, the interrogation began during the middle of the day in a public parking lot and only lasted approximately 90 minutes. *See*, *United States v. Casanova*, 2012 WL 760308, at *4 (S.D.N.Y. Mar. 8, 2012) (reasoning that a police interaction in a public parking lot at 5:00 pm "when it was still light outside" was a significant factor in finding a defendant was not "in custody"); *United States v. Carver*, 2024 WL 36988, at *9 (E.D.N.Y. Jan. 3, 2024) (finding that eighty-minute questioning did not indicate defendant was in custody). Law enforcement did not appear to question Defendant when they transported him from the parking lot to the hotel in a marked police vehicle, during which Defendant notably sat unrestrained in the front seat and maintained access to his phone. While one State Trooper did perform a brief pat down, such a protective search does not render the interrogation custodial. *See*, *United States v. Ndissi*, 2026 WL 1256192, at *5 (D. VT. May 7, 2026).

The second part of the interrogation took place in Defendant's hotel room, which the Government asserts is "akin to conducting an interview at an individual's home." *See*, Gov't's Post-Hr'g Opp'n at 30 n.14 (citing *United States v. Faux*, 828 F.3d 130, 135-36 (2d Cir. 2016)).

Courts routinely have found that circumstances are less likely to be custodial when an interrogation occurs in "familiar or at least neutral surroundings." *United States v. Newton*, 181 F. Supp.2d 157, 174 (E.D.N.Y. 2002). A hotel room, while perhaps not a direct equivalent to one's permanent residence, is, at least, a neutral setting where individuals enjoy constitutional protections and are less likely to experience the intimidation or compulsion typically associated with a police dominated atmosphere. *See*, *United States v. Stokes*, 733 F.3d 438, 443 (2d Cir. 2013) (describing Fourth Amendment protections applicable to motel rooms). Although Defendant did request permission to smoke a cigarette in the Bank of America parking lot, where smoking normally would be permissible, Defendant also felt comfortable enough to ask the agents for permission to finish an open beer can in his hotel room, which he was granted. This indicates that Defendant felt a degree of comfort and autonomy inconsistent with being in custody.

While multiple officers were present with visible weapons, no weapons were ever drawn. *See*, *FNU LNU*, 653 F.3d at 155 ("On the other hand: the officers never drew their weapons."). Additionally, Defendant never was handcuffed. Before one of the State Troopers could handcuff Defendant, another officer stopped him and stated that handcuffs were not needed because "this was on a consent." Tr. at 45:18-25. Whatever coercive effect that Defendant may have felt from seeing an officer approach with handcuffs was mitigated by this audible, explicit direction not to handcuff him. *Cf. Newton*, 181 F. Supp.2d at 174 ("Being placed in handcuffs clearly is a restraint associated with formal arrest and is often a key in determining if a suspect is in custody."); *See also*, *Faux*, 828 F.3d at 138 ("A reasonable person told that he was not under arrest would likely have understood that he was not about to be removed from his home to the police station—a significant factor in assessing the degree to which one is at the mercy of the authorities.") (cleaned up).

Finally, law enforcement maintained a friendly, conversational tone, did not threaten to arrest Defendant, and even sought his cooperation against his employers, suggesting that Defendant was not the primary target of their investigation. *See*, *Faux*, 828 F.3d at 139 (considering the conversational tone of the questioning); *Pence*, 172 F.4th at 220 ("Though the officers confronted Pence with potentially incriminating evidence, they did not threaten to arrest him; rather, they emphasized that the focus of their efforts was finding the 'people pulling the trigger … the big fish.'"). To the extent SA Collins inquired as to Defendant's immigration status, nothing in the record suggests it was done in a threatening manner such that a reasonable person in Defendant's shoes would feel "at the mercy" of law enforcement but rather as a purely administrative inquiry. *Faux*, 828 F.3d at 139.

On this record, the Court concludes that Defendant was not in custody during the February 1 Interrogation because the questioning was not conducted in a setting or fashion in which there were "the kinds of coercive pressures that would have undermined his will to resist and compelled him to speak." *Newton*, 181 F. Supp.2d at 175. As Defendant was not in custody, no *Miranda* warnings were necessary. Accordingly, Defendant's motion to suppress his statements from the February 1 Interrogation, including the provision of his cellphone passcode, is denied.[4]

**C. Defendant's December 2, 2024, Statements**

**1. Pre-*Miranda* Statements**

Defendant seeks to suppress all statements made during the December 2, 2024, interrogation (the "December 2 Interrogation") before he was advised of his *Miranda* rights on the

[4] The Court need not decide whether the provision of Defendant's cellphone passcode is testimonial pursuant to the act of production doctrine. *See*, *United States v. Gogic*, 770 F. Supp.3d 529, 538 (E.D.N.Y. 2025) ("Courts in the Second Circuit have split on the question of when and whether cell phone credentials are testimonial statements that qualify for Fifth Amendment privilege.") (collecting cases). Even if Defendant's cellphone passcode were testimonial, suppression would not be warranted since Defendant was not in custody and no *Miranda* warnings were required. If it is not testimonial, then *Miranda* is not implicated, and Defendant's consent to search his cellphone and the provision of his passcode only need be voluntary under the Fifth Amendment's Due Process Clause. *See*, section II.B.2., *infra*.

grounds that he was subjected to custodial interrogation in violation of his Fifth Amendment rights. *See*, Def.'s Post-Hr'g Mem. at 6. The Government contends that: (1) Defendant was not "in custody" until he was formally arrested in New Jersey and, thus, *Miranda* warnings were not necessary; and (2) law enforcement did not engage in custodial interrogation until after *Miranda* warnings were given and Defendant voluntarily waived his rights. *See*, Gov't's Post-Hr'g Opp'n at 33-34.

First, Court finds that Defendant was in custody after he was transported to the hotel and informed of the arrest warrant. Defendant was approached in his truck at night by at least three law enforcement officers wearing police vests with clearly marked police insignia. Then, in the hotel, SA Lawrenz told Defendant that they had an arrest warrant for him stemming from the money that the DEA had seized during the February 1 Interrogation. While SA Lawrenz told Defendant he was not under arrest, this case is readily distinguishable from *Pence* and similar cases where law enforcement informed suspects that they were not under arrest. *See*, *Pence*, 172 F.4th at 218-19 (defendant was not in custody when law enforcement executed a search warrant and explicitly told her that she was not under arrest). Here, after SA Lawrenz informed Defendant that he had an arrest warrant for him, he told Defendant that the next step was to decide whether he should be arrested in Massachusetts or New Jersey and explained the downside to each. There was no discussion about allowing Defendant to self-surrender on the warrant. No reasonable person faced with this illusory choice would have believed he or she was free to terminate the encounter and leave.

Next, the Court turns to Defendant's pre-*Miranda* statements. Any statements made before Defendant was in custody do not constitute custodial interrogation and need not be suppressed. *See*, *United States v. Taylor*, 17 F. Supp.3d 162, 171 (E.D.N.Y. 2014) (citing *Maryland v. Shatzer*,

559 U.S. 98, 113 (2010)). The fact that SA Lawrenz informed Defendant that there was an arrest warrant for him and subsequently asked whether he preferred to be arrested in Massachusetts or New Jersey also does not constitute custodial interrogation, because such declaratory statements and logistical questions are not reasonably likely to elicit evidence of a crime. *See*, *Familetti*, 878 F.3d at 57 ("[P]edigree questions that pertain to administration or a defendant's basic identification information do not trigger *Miranda*.") (internal quotation marks omitted). To the extent that, in response to these administrative or procedural questions, Defendant made any voluntary statements regarding his conduct or affiliation with the suspected money laundering organization, such responses do not "transmute [the] interview into an interrogation." *United States v. Shteyman*, 2011 WL 2006291, at *14 (E.D.N.Y. May 23, 2011).

However, SA Lawrenz also testified that he had asked Defendant in the hotel lobby whether he would be willing to discuss any of the people that he worked for. *See*, Tr. at 96:22-99:6. The mere discussion of cooperation is not, *per se*, interrogation where law enforcement "suggest[s] a defendant should discuss the possibility of cooperating with his attorney and merely supplied the defendant with general information regarding the crime he was suspected of committing, in response to the accused's own questions." *See*, *United States v. Sterritt*, 678 F. Supp.3d 317, 341 (E.D.N.Y. 2023) (citing *United States v. Guido*, 704 F.2d 675, 677 (2d Cir. 1983) (cleaned up). Here, however, SA Lawrenz just had informed Defendant that he possessed an arrest warrant and did not encourage Defendant to speak with an attorney. Nor did SA Lawrenz assure Defendant that he would not ask any further questions about any alleged illegal conduct. Under these circumstances, asking about potential cooperation is reasonably likely to elicit an incriminating response and constitutes custodial interrogation. *Cf. Sterritt*, 678 F. Supp.3d at 342 ("Thus, as in *Guido*, Special Agent Kougemitros indicated that Sterritt would not be questioned about the case

at that time, and there is no indication that the agents' conduct was designed to elicit an incriminating response.") (internal quotation marks omitted). Accordingly, because Defendant had not been given *Miranda* warnings at this time, any responses to this question were obtained in violation of Defendant's Fifth Amendment rights and must be suppressed.

**2. Post-*Miranda* Statements**

Defendant also seeks to suppress the statements he made after he was advised of his rights under *Miranda* on the grounds that: (1) law enforcement engaged in a deliberate two-step interrogation strategy designed to delay advising Defendant of his *Miranda* rights in order to undermine their effectiveness; (2) any waiver of Defendant's *Miranda* rights was involuntary; and (3) the prior illegality of Defendant's February 1, 2024, statements tainted his subsequent December 2, 2024, statements. *See*, Def.'s Mot. to Suppress at 18; Def.'s Post-Hr'g Mem. at 7-8. The Government counters that law enforcement did not impermissibly delay advising Defendant of his *Miranda* rights to undermine their effectiveness. *See*, Gov't's Post-Hr'g Opp'n at 33.

**a. 2-Step Interrogation**

"The purpose of the *Miranda* warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." *United States v. Carter*, 489 F.3d 528, 534 (2d Cir. 2007). Generally, where a defendant makes a statement prior to receiving *Miranda* warnings as well as a subsequent statement after receiving them, the admissibility of the second statement turns "solely on whether it is knowingly and voluntarily made." *Oregon v. Elstad*, 470 U.S. 298, 309 (1985). However, the Supreme Court has carved out an exception to this rule where law enforcement purposefully withholds *Miranda* warnings until after a suspect has made incriminating statements, and then administers *Miranda* warnings before obtaining a "post-

*Miranda* waiver and confession." *United States v. Capers*, 627 F.3d 470, 475 (2d Cir. 2010) (citing *Missouri v. Seibert*, 542 U.S. 600, 609-10 (2004)). Before assessing the voluntariness of a second statement made after *Miranda* warnings, a court first must "address whether the officers employed a 'deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview, and if so, whether 'specific, curative steps' were taken to obviate the violation that occurred." *Id.* at 477 (quoting *Seibert*, 542 U.S. at 621).

The Second Circuit has embraced a two-pronged analysis drawn from Justice Kennedy's concurrence in *Seibert* to determine whether a two-step interrogation strategy was employed by law enforcement to undermine the safeguards of *Miranda*. *See*, *Capers*, 627 F.3d at 476 (citing *Seibert*, 542 U.S. at 620, 622 (Kennedy, J., concurring)). First, the court must determine whether the initial statement, "though voluntary, [was] obtained in violation of the defendant's *Miranda* rights." *United States v. Moore*, 670 F.3d 222, 229 (2d Cir. 2012). If not, the analysis concludes at this stage. However, if the answer is yes, then the Government bears the burden to show, by a preponderance of the evidence, that law enforcement did not engage "in a deliberate two-step process calculated to undermine the defendant's *Miranda* rights." *Id.* at 230.

At step two, a court must "'review the totality of the objective and subjective evidence surrounding the interrogations,' guided by—but not limited to—the factors identified by the plurality in *Seibert*." *Id.* (quoting *Capers*, 627 F.3d at 479). The five *Seibert* factors include:

> (1) the completeness and detail of the questions and answers in the first round of interrogation[;] (2) the overlapping content of the two statements[;] (3) the timing and setting of the first and second interrogation[;] (4) the continuity of police personnel[;] and (5) the degree to which the interrogator's questions treated the second round as continuous with the first.

*Capers*, 627 F.3d at 475 (internal quotation marks omitted). If a court finds the Government did employ a deliberate two-step strategy, the post-*Miranda* statements should be suppressed unless

"curative measures . . . designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver" are taken "before the postwarning statement is made." *Moore*, 670 F.3d at 228. If the Government successfully carries its burden at step two, then the statements are admissible so long as they were voluntarily made. *Id.* at 230.

As explained above, law enforcement did obtain statements from Defendant in violation of *Miranda*. *See*, section I.C.1., *supra*. However, considering the totality of the evidence, the Court finds that law enforcement did not employ a deliberate two-step interrogation strategy to undermine Defendant's constitutional rights. For instance, the first and second statement were taken between 90 and 120 minutes apart, at most. *See*, *Capers*, 627 F.3d at 484 (finding ninety minutes between the first and second questioning was evidence of deliberate strategy). Further, there was complete, direct continuity of law enforcement as SA Lawrenz conducted both the initial and second round of questioning. *See*, *United States v. Tartaglione*, 2023 WL 2237903, at *20 (S.D.N.Y. Feb. 27, 2023).

To be clear, there are some factors that weigh in Defendant's favor. However, other factors weigh more heavily against finding a two-step interrogation. The record suggests that the initial questioning was limited to Defendant's potential cooperation against his employers. For this reason, the purported overlap between the two statements was minimal. The initial questioning, for instance, did not concern the people actually involved in the money laundering scheme, Defendant's role, or any other details that may have been elicited in the second round of questioning. *See*, *United States v. Tirado*, 2018 WL 3432040, at *19 (S.D.N.Y. July 16, 2018) (finding that a limited first interrogation followed by a second, "much broader" investigation was not evidence of a deliberate strategy). Further, the degree to which the second round of questioning

was continuous of the first also necessarily is limited given the narrow scope of questions asked during the first round. Any new questions that SA Lawrenz asked beyond the scope of potential cooperation do not support a finding of a deliberate two-step strategy. *Cf. Tartaglione*, 2023 WL 2237903, at *20 ("Finally, once the Investigators began the [second] interview in the police barracks, Hammer stated that they wanted to continue talking about the same topics.").

Considering the *Seibert* factors and the totality of the circumstances presented, the Court concludes that the Government has met its burden in demonstrating by a preponderance of the evidence that law enforcement did not engage in a deliberate two-step interrogation to undermine Defendant's Fifth Amendment rights.

**b. <u>Voluntariness</u>**

A waiver of one's *Miranda* rights is considered "voluntary" when it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *United States v. O'Brien*, 926 F.3d 57, 73 (2d Cir. 2019) (internal quotation marks and citations omitted). "Coercive police activity is a necessary predicate to holding a confession constitutionally involuntary." *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) (cleaned up). To find a waiver involuntary, a court must make specific findings "that under the totality of the circumstances . . . the defendant's will was overborne" by law enforcement's conduct *Id.* (quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)).

Defendant concedes that he waived his *Miranda* rights. *See*, Def.'s Mot. to Suppress at 18. Defendant's sole contention is that his *Miranda* waiver was involuntary by virtue of SA Lawrenz's threats to report Defendant to ICE and promises not to prosecute his son in exchange for Defendant's cooperation. *Id.* SA Lawrenz testified that he did not threaten to report Defendant to ICE if he failed to cooperate. Tr. at 82:20-23. Indeed, SA Lawrenz himself works for ICE. SA

Lawrenz also testified that he did not know who Defendant's son was, made no promise not to prosecute Defendant's son, and did not even have the authority to make such a promise. *Id.* at 82:24-83:7. In fact, Defendant was completely unknown to the investigating agents at the time they first encountered him. *Id.* at 13:4-15. On this record, there is no evidence that Defendant's *Miranda* waiver was anything but voluntary and, as such, his statements made thereafter are admissible.

### c. <u>The Alleged Illegality of the February 1 Interrogation</u>

Finally, Defendant argues that the prior illegality of the February 1 Interrogation "tainted his subsequent December 2, 2024, statement," such that his post-*Miranda* statements should be suppressed. *See*, Def.'s Post-Hr'g Mem. at 8. Defendant cites only one case from the Ninth Circuit where the court found that law enforcement illegally detained and questioned an individual without informing him of his *Miranda* rights and then, eight months later, asked the individual additional questions outside his home where he confessed to the crime. *See*, *United States v. Bocharnikov*, 966 F.3d 1000, 1004 (9th Cir. 2020). The 9th Circuit suppressed statements from the second encounter, holding that, because law enforcement directly referenced the prior illegal interrogation, the second encounter was a "de facto extension" of the first, notwithstanding the eight-month gap between encounters. *Id.*

Defendant fails to cite a single case in this circuit that either cites to *Bocharnikov* or adopts a similar theory to support suppression. Even if he had, given the Court's ruling above that Defendant was not in custody during the February 1 Interrogation, any reference to the February 1 Interrogation by SA Lawrenz necessarily cannot taint the December 2 Interrogation. Accordingly, Defendant's motion to suppress is granted only as to any pre-*Miranda* statements made in response to SA Lawrenz's questions about cooperation, and denied as to all other

statements made during the December 2 Interrogation.

## II. Suppression of Physical Evidence

### A. Legal Standard

"The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006) (internal quotation marks omitted). However, "a warrantless search does not violate the Fourth Amendment if the authorities have obtained the voluntary consent of a person authorized to grant such consent." *United States v. Hernandez*, 85 F.3d 1023, 1028 (2d Cir. 1996) (internal quotation marks omitted). The Government has "the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary." *United States v. Isiofia*, 370 F.3d 226, 230 (2d Cir. 2004).

Consent is voluntary where it is "a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995) (internal citations and quotation marks omitted). "Voluntariness is a question of fact determined by a totality of all the circumstances." *Isiofia*, 370 F.3d at 231 (internal quotation marks omitted). To determine whether an individual's consent was voluntary, courts may consider, *inter alia*:

> (1) the defendant's age, education, and intelligence; (2) the length of detention; (3) the use of physical punishments or deprivations; (4) whether the alleged consenting person was advised of his constitutional rights; (5) whether the defendant was in custody and in handcuffs; (6) whether there was a show of force; (7) whether the agents told the defendant that a . . . warrant would be obtained; (8) whether the defendant previously had refused to consent; (9) whether the officers threatened or mistreated the defendant's family; and (10) whether the officers lied or otherwise psychologically coerced the defendant to obtain his consent.

*United States v. Brown*, 2023 WL 208171, at *10 (S.D.N.Y. Jan. 13, 2023) (cleaned up) (collecting

cases). While "knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent." *United States v. O'Brien*, 926 F.3d 57, 76 (2d Cir. 2019) (internal quotation marks omitted). "[T]he ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." *Id*. at 77 (citing *Garcia*, 56 F.3d at 423).

**B. Suitcase 1, Suitcase 2, and Defendant's Cellphone**

Defendant moves to suppress the currency seized from Suitcases 1 and 2 and the contents of his cell phone (1) as fruits of statements obtained in violation of his Fifth Amendment rights, and (2) on the basis that his consent to the searches was involuntary. *See*, Def.'s Mot. to Suppress at 15-16; Def.'s Post-Hr'g Mem. at 8-10. The Government opposes on the grounds that SA Collins had a reasonable basis to believe that Defendant gave valid consent to each search, and that Defendant's will was not overborne such that his consent was involuntary. *See*, Gov't's Post-Hr'g Opp'n at 30-32.

**1. Fruits of A *Miranda* Violation**

As an initial matter, Defendant incorrectly contends that suppression of his consent and the fruits of the resulting searches is the appropriate remedy for a purported *Miranda* violation. First, as detailed above, there was no violation of *Miranda* during the February 1 Interrogation. Second, the Supreme Court clearly has stated that "the physical fruits of a voluntary, unwarned statement do not implicate the Self Incrimination Clause, and therefore, [any] such physical evidence is admissible." *United States v. Faltine*, 2014 WL 4370811, at *15 (E.D.N.Y. Sept. 2, 2014) (citing *United States v. Patane*, 542 U.S. 630, 639-40 (2004)); *United States v. Wang*, 2024 WL 1251105, at *9 (S.D.N.Y. Mar. 22, 2024) (same).

Third, the Second Circuit has instructed that "consent to search is not 'evidence of a

testimonial or communicative nature," and, thus, obtaining a defendant's consent to a search without giving the defendant his *Miranda* warnings does not violate the Fifth Amendment. *See*, *United States v. Faruolo*, 506 F.2d 490, 495 (2d Cir. 1974); *See also*, *Flynn v. James*, 513 Fed. App'x 37, 39 (2d Cir. Feb. 28, 2013) (explaining that consent to search is not testimonial and, therefore, did not implicate the Fifth Amendment right to counsel). Thus, suppression of Defendant's consent to search would not be appropriate even if there was a *Miranda* violation during the February 1 Interrogation. *See*, *Quarles*, 467 U.S. at 669 (1984) (O'Connor, J., concurring) ("The harm caused by failure to administer *Miranda* warnings relates only to admission of testimonial self-incriminations, and the suppression of such incriminations should by itself produce the optimal enforcement of the *Miranda* rule.").

**2. <u>Voluntariness</u>**

Based on the totality of the circumstances, the Court finds that Defendant's consent to search Suitcase 1, Suitcase 2, his hotel room, and his cellphone was voluntary. Nothing in the record about Defendant's age, education, or intelligence suggests he is particularly vulnerable to coercion. *See*, *United States v. Jimenez*, 2012 WL 4887740, at *4 (S.D.N.Y. Oct. 10, 2012); *Cf.*, *United States v. Garcia*, 554 F. Supp.3d 421, 433 (E.D.N.Y. 2021) (finding a "less psychologically stable" defendant "more vulnerable to coercion than a typical person"). The length of the detention was relatively short at just over an hour. *See*, *United States v. Gomez*, 199 F. Supp.3d 728, 746 (S.D.N.Y. 2016) (obtaining consent within 15 minutes of a traffic stop in a public area supported a finding of voluntary consent); *Cf.*, *Garcia*, 554 F. Supp.3d at 434-35 (explaining that presence of law enforcement for 12 hours supported a finding of involuntary consent). There is also no evidence of any physical punishment or deprivation or a showing of force or physical restraint or brandishing of weapons. *See*, *Gomez*, 199 F. Supp.3d at 746; *Cf.*, *Garcia*, 554 F. Supp.3d at 435.

Nor did law enforcement threaten to get a warrant, threaten Defendant's family, or attempt to psychologically coerce Defendant.

Defendant argues that the fact that he was not informed of his *Miranda* rights heavily weighs against a finding of voluntariness. This argument fails for two reasons. First, as Defendant was not in custody during the February 1 Interrogation, law enforcement was not required to read him his *Miranda* rights. Second, even if he was in custody, *Miranda* warnings are "not a prerequisite to obtaining a valid consent to search." *United States v. Moreno*, 701 F.3d 64, 77 (2d Cir. 2012) (citing *Faruolo*, 506 F.2d at 495).

Defendant also maintains that he could not consent voluntarily because he is not a native English speaker and was not informed of his right to refuse to consent to a search. Defendant's reliance on *Isiofia* is misplaced. When faced with similar arguments in a subsequent case, the Second Circuit explained:

> O'Brien's effort to liken his case to *Isiofia*, in which we affirmed the grant of a suppression motion, falls woefully short. In *Isiofia*, the district court had plausibly found that a defendant's consent to search his apartment, computer, and car was not voluntary when it was given only after, *inter alia*, (a) agents entered Isiofia's apartment unlawfully, (b) eight agents remained in the living room with him for up to an hour and a quarter without a valid reason to remain there, (c) the agents did not tell him with what crime he was being charged, and (d) they gave Isiofia—who lacked fluency in English—two consent-to-search forms that did not describe the nature of the objects to be seized (one leaving that detail "blank" and the other being "helplessly vague").

*O'Brien*, 926 F.3d at 77 (internal citations omitted). During the February 1 Interrogation, there was no unlawful entry, Defendant was not under arrest, and he never was handcuffed. Despite Defendant's inability to speak English, SA Collins used Google translate throughout the February 1 Interrogation, which gave Defendant a viable means of communication. Thus, the only fact analogous to *Isiofia* is that Defendant was not informed of his right to refuse to consent, which,

alone, is not sufficient to render his consent involuntary. *Id.* ("Fourth Amendment Standards do not make it mandatory to advise a suspect of his right to refuse consent to search."); *See also*, *United States v. Cabrera*, 2023 WL 8812532, at *7 (S.D.N.Y. Dec. 20, 2023).

Based on the totality of the circumstances, the Court concludes that the Government has met its burden to demonstrate that Defendant's consent to search Suitcase 1, Suitcase 2, his hotel room, and his cellphone was knowing and voluntary. Accordingly, Defendant's motion to suppress the fruits of these searches is denied.

## CONCLUSION

For the foregoing reasons, Defendant's motion to suppress is granted only with respect to any pre-*Miranda* statements made during the December 2 Interrogation in response to SA Lawrenz's questions about cooperation, and is denied in all other respects.

SO ORDERED.

Dated: Brooklyn, New York
October 20, 2026

/s/
DORA L. IRIZARRY
United States District Judge